**STATE of Minnesota, Appellant,**

**v.**

**James Murl PAYNE, Respondent.**

**No. C1–86–2093.**

Court of Appeals of Minnesota.

March 31, 1987.

Review Granted April 29, 1987.

Hubert H. Humphrey, III, Atty. Gen., St. Paul, Alan L. Mitchell, St. Louis Co. Atty., Vernon D. Swanum, Asst. Co. Atty., Duluth, for appellant.

C. Paul Jones, State Public Defender, Bradford W. Colbert, Asst. Public Defender, Minneapolis, for respondent.

Heard, considered and decided by HUSPENI, P.J., and PARKER and LESLIE, JJ.

## OPINION

HUSPENI, Judge.

This is a pretrial appeal by the State from an order suppressing evidence as unconstitutionally obtained. We affirm.

## FACTS

The State alleges that in the early morning hours of May 4, 1986, Sergeant Roger Waller of the Duluth Police Department responded to a report of a possible house prowler. The description given was that of a man possibly wearing dark pants or dark sweatpants. Shortly thereafter, he saw three men entering a parked car within 2½ blocks of the location of the reported crime. Sergeant Waller was suspicious because the three wore dark clothing and were in a high crime area where a prowler had been reported.

Sergeant Waller approached the vehicle and obtained identification from the three occupants. Bret Fritz was in the driver's seat, Anthony Schnorr occupied the front passenger seat, and James Payne was in the rear seat. Sergeant Waller radioed the information to the police communications center.

After reviewing the identification, which appeared to be in order, Sergeant Waller decided to question each person separately. He ordered Fritz to step out. As Fritz got out, Officer Champion came around the corner with a police dog who was following a track from the house where the prowler had been reported. The dog went to the location where Waller had first observed Fritz, Payne and Schnorr.

Sergeant Waller frisked Fritz for weapons and located an empty film canister, apparently containing the residue of marijuana. Waller asked Fritz what he had been doing and Fritz said that all three men had returned from the Twin Cities only five to ten minutes before. Sergeant Waller became more suspicious and ordered Payne out and frisked him for weapons. During the frisk, marijuana and a pistol were found. Following a search of Payne at the police department, valium and

percodan were found in his pants pocket. Cocaine was also found in one of his pockets.

About the time Payne was initially being frisked, Officers Hartley and Kovanen arrived. Officer Waller told them he had located a gun on Payne and that another suspect in the car had not been checked. Officer Hartley approached the car and observed Schnorr lean forward as if to place something on the floor. Schnorr was asked to get out and was frisked. The car was searched, and cocaine and other controlled substances were found.

Payne and Schnorr were charged with several possession offenses. Following a joint omnibus hearing, the trial court ruled that the initial stop of the three men was valid but that the subsequent frisk for weapons was impermissible. The trial court suppressed all the controlled substances found on Payne and the pistol. The court also suppressed any statements by Payne during or following the search of his person. The court allowed Payne to stand trial on charges of possession of cocaine found within the car. The State appealed.

## ISSUE

Did the trial court clearly err in ruling that the police officer made an unconstitutional frisk for weapons?

## ANALYSIS

In a pretrial appeal, we will reverse the determination of the trial court only if the State demonstrates clearly and unequivocally, first, that the trial court erred in its judgment, and second, that unless reversed, the error will have a critical impact on the outcome of the trial. *State v. Kim*, 398 N.W.2d 544, 547 (Minn.1987); *State v. Webber*, 262 N.W.2d 157, 159 (Minn.1977).

Critical impact exists when the suppression order seriously impedes continuation of the prosecution. *Kim*, 398 N.W.2d at 551. We have no doubt that this prong has been met with regard to Payne because

the order does seriously impede continuation of prosecution for most of the charges. Thus, the issue is whether the court clearly erred in its ruling.

■ Payne concedes that the initial stop was justified based on the men's quick movements to their car, their proximity to the crime scene, the darkness of their clothes and that they were in a high crime area. Officer Waller demanded and the three men produced identification. This clearly was proper in the course of a lawful investigatory stop, where interrogation may include a request for identification. *United States v. Hensley*, 469 U.S. 221, 105 S.Ct. 675, 680, 83 L.Ed.2d 604 (1985). The registration check revealed the driver, Fritz, was the owner of the vehicle.

The omnibus court determined that Sergeant Waller had no cause or reason to detain or frisk any of the men following their identification clearance. The court concluded that the suspects should have been released once their identification had been established.

The trial court's ruling was partly in error. In *State v. Ferrise*, 269 N.W.2d 888 (Minn.1978) the Minnesota Supreme Court held that where a police officer wanted to see if a passenger of a lawfully stopped car could aid in accurately identifying the driver and the officer opened the car door, the intrusion into the passenger's privacy was minimal, reasonable and proper. In the course of its opinion the court discussed the United States Supreme Court case of *Pennsylvania v. Mimms*, 434 U.S. 106, 98 S.Ct. 330, 54 L.Ed.2d 331 (1977):

In that case, the United States Supreme Court was presented with the issue of the permissibility under the Fourth Amendment of a police practice of routinely ordering drivers out of automobiles lawfully stopped for minor traffic violations. In upholding the practice against the Fourth Amendment challenge, the court followed the now familiar balancing approach for determining the reasonableness of the police action. The proffered justification for the police practice of ordering lawfully stopped

drivers to get out of their cars was that "[e]stablishing a face-to-face confrontation diminishes the possibility, otherwise substantial, that the driver can make unobserved movements; this, in turn, reduces the likelihood that the officer will be the victim of an assault." 434 U.S. 110, 98 S.Ct. 333, 54 L.Ed.2d 336. Terming this justification "both legitimate and weighty," the court balanced it against "the intrusion into the driver's personal liberty occasioned not by the initial stop of the vehicle, which was admittedly justified, but by the order to get out of the car." 434 U.S. 111, 98 S.Ct. 333, 54 L.Ed.2d 337. The court characterized this additional intrusion as being "de minimus."

*Ferrise*, 269 N.W.2d at 890 (footnote omitted).

In *State v. Gilchrist*, 299 N.W.2d 913 (Minn.1980), the court discussed the lawfulness of a stop and frisk for weapons. The court noted, "When the stop is of an automobile, *it is proper for the officer for his safety to require occupants of the automobile to get out*." *Id.* at 916. (Emphasis added.) *See also State v. Pleas*, 329 N.W.2d 329 (Minn.1983); *State v. Willis*, 320 N.W.2d 726 (Minn.1982). Thus, Officer Waller could have ordered the three men out of the car. However, whether he was justified in frisking for weapons is another question.

■ A "frisk" is a search within the meaning of the fourth amendment. *Terry v. Ohio*, 392 U.S. 1, 16, 88 S.Ct. 1868, 1877, 20 L.Ed.2d 889 (1968). A protective search for weapons is permissible when there is a reason to believe the suspect may be armed and dangerous. *Id.* at 27, 88 S.Ct. at 1883; *Adams v. Williams*, 407 U.S. 143, 146, 92 S.Ct. 1921, 1923, 32 L.Ed.2d 612 (1972). Here Sergeant Waller was alone investigating a possible house prowl, a felony, in a high crime area in the middle of the night. He stopped a car containing three occupants who wore dark pants, similar to the description of the prowler, within two blocks of the alleged incident. Sergeant Waller did not articulate any valid purpose

in conducting a frisk. Arguably, safety concerns justified the frisk. However, Sergeant Waller could have immediately ordered the suspects out of their car as in *Willis*, 320 N.W.2d at 727 or *Gilchrist*, 299 N.W.2d at 915. Instead, the officer went to the car and obtained identification from the three men while they were in their car. The right to frisk "must be immediate and automatic if the reason for the stop is * * an articulable suspicion of a crime of violence." *Terry*, 392 U.S. at 33, 88 S.Ct. at 1886 (Harlan, J. concurring). *See* W. Lafave, *Search and Seizure*, § 9.2(f), 9.4 (1986) and cases cited; *Model Code of Pre-Arraignment Procedure*, § 110.02(4) (1975) (officer who stops a person may pat down for weapon "if the officer reasonably believes that his safety or the safety of others then present so requires.")

In *Gilchrist*, 299 N.W.2d 913, the supreme court allowed a stop for identification and some sort of frisk. However, there the police suspected an armed man wanted for involvement in a Nebraska homicide may have been in a vehicle outside an alleged "after-hours joint." The police also knew that the year before in a prior incident the man had allegedly shot at another person at an "after-hours joint" and fled. The court cited the man's violent history, the nature of the alleged crime, the time of day and location of cars justifying the police action in ordering him out and frisking him. *Id.* at 917.

Finally, we cannot agree with the State's contention that the trial court erred in its analysis of this court's opinion in *State v. Berg*, 383 N.W.2d 7 (Minn.Ct.App.1986). In that case evidence suppressed by the trial court was declared on appeal to be admissible. The trial court here correctly distinguished the facts of *Berg* from the facts of this case. In *Berg*, at 4:20 a.m. on a cold, snowy morning when there was little vehicular and almost no pedestrian traffic, the police received a call of a theft in progress and were given descriptions of two suspects. An officer receiving the offense report was five to six blocks from the scene and observed an individual fitting one suspect's description walking in the indicated direction of flight. The officer stopped the suspect and after a pat down and preliminary questioning was able to verify that the suspect had lied about his whereabouts immediately preceding the stop. The suspect was then arrested and searched. The trial court ruled that there was no probable cause to arrest and suppressed evidence obtained as a result of the search. This court, in a split decision, reversed, noting:

> The fact that respondent was outside at that time, fit the description, and was seen close to the scene shortly after the crime was at least sufficient to require an investigatory stop. When the police learned that respondent had lied, probable cause was clearly established.

*Id.* at 10.

The circumstances of this case clearly are distinguishable from those in *Berg*. There, each step of the officer's investigatory process supported and escalated the probable cause basis for an arrest. In the present case the officer's articulable suspicions were satisfied upon inquiry and there was no valid reason for the frisks that subsequently were conducted.

We agree with the trial court's conclusion that the evidence found on Payne must be suppressed as fruit of an unlawful search and seizure.

### DECISION

The order of the trial court suppressing the evidence found on the person of Payne is affirmed.

Affirmed.

LESLIE, J., dissents.

LESLIE, Judge (dissenting).

I respectfully dissent because I am of the opinion that *State v. Berg*, 383 N.W.2d 7 (Minn.Ct.App.1986) cannot be adequately distinguished. I would reverse and hold that the trial court erred in suppressing

evidence found on Payne after what I perceive to be a lawful search.